**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CONNIE D. RODDY,** | : | |
| **Plaintiff** | : | **Civil Action No. 1:06-CV-1279** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **DONALD C. WINTER, Secretary of the** | : | |
| **Department of the Navy,** | : | |
| **Defendant** | : | |

**<u>MEMORANDUM</u>**

This is an employment discrimination suit brought pursuant to Title VII of the Civil

Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-16, the Age Discrimination in Employment

Act ("ADEA"), 29 U.S.C. § 623(a)(1), and the Rehabilitation Act, 29 U.S.C. §§ 791, 794a.

Plaintiff alleges that Defendant unlawfully terminated her employment because of either her sex,

age, or disability,  or in retaliation for complaining of discrimination.  Before the Court is

Defendant's motion for summary judgment.  (Doc. No. 19.)  For the reasons that follow, the

motion will be granted in part and denied in part.

## I.       BACKGROUND

### A.       Factual Background

#### 1.       *Events leading up to Plaintiff's Employment*

In January 2003, Plaintiff Connie Roddy applied for a position as an electrician at the

Public Works Department ("PWD") of the Naval Support Activity in Mechanicsburg,

Pennsylvania.  Having heard a rumor that a former employee was "pre-selected" to fill the

position, Roddy contacted the Human Resources Office to inform them of the situation.  In a

letter purportedly sent to Human Resources,[1] Roddy alleged that the "Good Old Boy syndrome seems to be a strong unwritten guideline within the [PWD]" and that "[w]ith this kind of opposition in the way, I don't see where there will ever be a female electrician within the [PWD] whether highly qualified or not, now or in the future." (Def's Ex. 5) The Human Resources Office assured Roddy that, rumors aside, the position had not been filled.

After Roddy had submitted the letter, Edward Strayer, the production superintendent at PWD, had been directed to hire her. Strayer then provided Russell Wolf, a first-line supervisor at PWD, with several applications for the position and told him to "review the resumes carefully when making the selection." (Strayer Dep. 17; Pl's Ex. F.) After reviewing the applications, Wolf recommended that Roddy be hired because "she had a very good resume history of working in electrical and, also, on the last page of her resume, it sticks in my mind when I read it, she said, don't discriminate against me for being a woman. I've worked with other women in the trade on the outside." (Wolf Dep. 13-14; Pl's Ex. B.) In fact, on Roddy's resume, Roddy did note that she had "a proven track record; and I have excelled in all my electrical positions. I'm highly regarded among my peers because they judged me according to my abilities and outgoing personality; not as an adversary nor [were] they intimidated because of my sex." (Def's Ex. 4.) Roddy was the first woman that Wolf recommended that PWD hire. (Fact Finding Tr. 156; Def's Ex. 6.)

Roddy's employment began with PWD on March 10, 2003, as a probationary employee at Wage Grade-10. According to Carol Annucci, a Human Resources Specialist at PWD, because

---

[1] Defendant disputes the authenticity of this letter, though Defendant does not appear to dispute that Roddy actually sent a letter.

of her status as a probationary employee, Roddy had a year to "demonstrate their knowledge and skills, abilities to do the job that [she had] been hired for." (Annucci Dep. 11-12; Pl's Ex. E.) However, if there were "any problems, either with attendance or performance or behavior, [the agency could] take action to terminate the [her] anytime during that period." (Id.); accord 5 C.F.R. § 315.804 (concerning termination of federal probationary employees for unsatisfactory performance).

### 2.       Roddy's early employment experience at PWD

On the first day of Roddy's employment, March 10, 2003, there was friction between Roddy and Wolf. As Roddy describes it in her Lifer Notebook,[2] Wolf gave Roddy minimal direction and then chastised her for failing to do certain things, despite the fact that he had not told her that she needed to do those things. Wolf did not show Roddy where her tools were (or what tools were needed), and he did not show her where the restrooms were. In her estimation, Roddy and Wolf had "a SERIOUS communication problem," and by her third day of employment Roddy concluded that Mr. Wolf was a "jerk."

### 3.       The Scissors-Lift Incident

Among her responsibilities as an electrician at PWD, Roddy repaired lighting, cleaned transformers, and re-lamped warehouses. The last of these activities—re-lamping—involved the use of a "scissors lift," which Roddy describes as a "portable scaffold" of approximately five to six feet in length that lifts up to around twenty feet in the air in order to access high ceilings. (Roddy Dep. 74; Pl's Ex. A.) On April 18, 2003, Roddy worked with another employee, Frank Morris, to re-lamp a warehouse on a scissors lift. Both Roddy and Morris were on the lift, and

---

[2] Roddy kept daily notes in a notebook, which she calls a "Lifer Notebook."

Roddy operated the controls.  After Roddy told Morris to "watch his fingers" and "watch his head," she proceeded to raise the lift to reach the lights between the ceiling beams.  Attempting to pick up a screwdriver, Morris placed his hand on the safety rail, and his hand became lodged between the rail and a ceiling beam.  When he yelled for Roddy to lower the lift, she accidentally raised it further.  Morris's hand was crushed, and he was rushed to the emergency room.

When told about the accident, Wolf said something to the effect that he "ought to write [Roddy] up for that," though he did not formally discipline her for the accident.  He did, however, tell Roddy that should she want to go to the hospital with Morris, she would be docked leave for that time.  (Roddy Dep. 84; Pl's Ex. A.)  Later, out of concern that Wolf would "do something," (Roddy Dep. 88), Roddy submitted a written witness statement for Morris's injury report (Def's Ex. 12), in which she described the accident and her role in it.  In the injury report, and in his deposition testimony, Morris acknowledged that he left his hand on the safety rail despite Roddy's warning.  (Def's Ex. 12; Morris Dep. 22, Pl's Ex. C.)

### 4.    *The Transformer Incident*

In May 2003, Roddy and another employee, Frank DeNofa, worked together on a project involving a high-voltage transformer.  After working for about an hour, the two left the job site and drove to another building for a break.  In doing so, they walked past Wolf's office window and Wolf decided to check on their progress on the assignment.  When he arrived at the site, Wolf discovered what he perceived to be a dangerous situation: the transformer door was ajar; the door to the high-voltage switch open; the panels were off the high-voltage transformer; there was no lockout tag on the transformer high-voltage switch; and no grounds were applied.  While the record is somewhat mixed as to whether the situation was *actually* dangerous, Wolf screamed

4

at Roddy and DeNofa when they arrived at the site.  Wolf told the two employees that he would

"make a note" of the incident, but no disciplinary action was initiated as a result thereof.

Later that month, despite the incident, Wolf recommended that several employees,

including Roddy, receive a cash bonus for their "very good, craftsman-like" overtime work on a

series of transformers.

### 5. *The Extra-Employee Incident*

On one occasion in June 2003, Wolf found that Roddy had enlisted the aid of another

employee in order to complete an assigned task.  According to his testimony during an internal

investigation, Wolf took issue with the situation because Roddy and Morris were working on a

project he believed that "she should [have been] able to do herself.  [Morris] wasn't needed

there."  (Def's Ex. 6, at 216.)  Roddy disputes the characterization, describing the incident as

follows:

> I'm at a building down in a warehouse relamping a lamp. [I]'m
> standing on a bridge crane that [is] a platform that goes across the
> building.  There's a big light in the center of this.  I'm trying to hold
> it up.  I'm trying to wire the thing, change the lights out in it, rewire
> I.  I just cannot do it . . . standing that high on a four-foot ladder,
> trying to hold a light.  If I fall, then I fall . . . 40 feet.  I'm asking
> assistance and I don't see a problem with that.

(Roddy Dep. 110; Pl's Ex. A.)  No discipline came as a result of this incident.

### 6. *Roddy's injury*

On July 8, 2003, while carrying a ladder and tool bag, Roddy fell into a hole, and twisted

her ankle and knee, resulting in torn cartilage and a meniscus tear.  After surgery on her knee on

July 22, 2003, Roddy was unable to report back to work until September 8, 2003.  While she was

unable to work, Roddy received worker's compensation benefits.  On her return to work, Roddy

was restricted to limited duty, and Wolf assigned her to complete certain non-electrical tasks, including cleaning out a closet and reorganizing the tool room.

### 7.    The Silent-Alarm Incident

On September 12, 2003, Wolf assigned Roddy to assist Frank Morris with a security job, which required them to pull wires from a wall.  In the course of the assignment, Roddy and Morris stuck a "fish tape" in a conduit, thereby accidentally triggering a silent alarm.  Once the silent alarm was activated, security immediately surrounded the building in which Roddy and Morris were working.  While the building was evacuated and searched, Roddy and Morris waited.  Morris then returned to finish the job.

At the time, Wolf was unaware of the fact that the silent alarm had gone off, and neither Roddy nor Morris told him about what had transpired.  Later, Wolf returned to check on the progress of the job and found Roddy standing with her arms folded, while Morris worked.  When Wolf asked why she was not helping Morris, she replied that the job was finished.

### 8.    The Claude Kentner Incident

On September 26, 2003, Roddy was assigned to assist a plumber, Claude Kentner, with a job that Wolf expected would take approximately 15 minutes.  Once Roddy and Kentner actually started the project, they learned that it was "a little more involved than" originally anticipated. (Roddy Dep. 139; Pl's Ex. A.)  Later, when Roddy returned, Wolf reprimanded her and Kentner for taking longer than expected.  Wolf then "chewed out" Roddy for "being over to the union office and . . . for going to the bathroom [and] for helping [Kentner]."  (Id.)

### 9.    Roddy's job restrictions

Between September 8, 2003, and October 17, 2003, Roddy worked on a couple of light-

duty assignments.  When she initially returned, Roddy presented Wolf with a note from her physician regarding her work restrictions, which he claimed he could not read because he felt the handwritten instructions were illegible.  When Wolf requested a legible copy, Roddy orally recited each restriction, and told him that he would have to wait until the doctor's staff could provide another copy.  Wolf told Roddy that he would need to seek guidance from human resources, which Roddy considered unnecessary.  On September 31, 2003, Wolf again asked for a legible copy of the restrictions, and Roddy again refused.

In October 2003, administrative staff faxed Roddy's physician a request for a description of her work restrictions.  The fax was marked "Urgent" and indicated that if the request was not fulfilled, Roddy could be sent home without pay.  Two weeks later, administrative staff again attempted to contact the physician's office.  On October 17, 2003, Wolf advised Roddy in a letter that, because he did not have a written description of her work restrictions, Roddy should not to report to work the following business day.

Roddy contends that Wolf never told her what information he needed, and that he persisted instead in calling her physician "two or three times a day."  She further claims that she would have resolved the situation if she had known about it.

On October 23, 2003, after receiving the necessary information from Roddy's physician's office, the Navy sent Roddy a letter offering her the opportunity to return to work within the limitations designated by her physician.  Roddy accepted, and returned to work on November 2, 2003.  Between October 17 and November 2, Roddy received worker's compensation benefits.

On November 7, 2003, shortly after her return to work, Roddy's physician added an additional restriction—"no crawling"—to her work restrictions.  Wolf told Roddy her that he

could not accommodate this additional restriction and, on numerous occasions thereafter, sent her home—ostensibly because there were no work assignments that she could perform.  Roddy believed that Wolf's decision to send her home constituted a "refusal" rather than "inability" to accommodate her.

### 10.    *The events leading to termination*

On the same day that Roddy notified Wolf of the "no crawling" restriction, Wolf sent a detailed email to Carol Annucci in the Human Resources Department outlining Roddy's performance issues during her probationary period and recommending that her employment be terminated.  Before the email, Wolf had not issued any written warnings to Roddy.  Wolf told Annucci that he did not feel that Roddy was "able to accomplish the tasks that the position description defines" and that several incidents caused him to "question her working knowledge and ethics."  (Def's Ex. 22.)  In particular, Wolf described the scissors-lift incident, the transformer incident, the extra-employee incident, and her injury and related work restrictions." (Id.)  Wolf said that he was "not satisfied with her performance on the job, and that she is on a one year probation.  From March 10th until July 8th she wasn't performing to our standard.  Her next doctor appointment is 1/29/03, with the way the doctor is giving limitations to her to perform her duty, I question her coming back to work then."  (Id.)

On February 13, 2004, Roddy's employment was terminated in a letter signed by Commander Daniel Therrien.  (Def's Ex. 23.) The letter cited poor work performance during the course of her probationary term as the reason for her termination, and identified the scissors-lift, transformer, extra-employee, and silent-alarm incidents.

**B.      Procedural Background**

On January 7, 2004, Roddy filed a formal equal employment complaint, alleging

discrimination.  (Pl's Ex. G.)  The EEOC dismissed Roddy's action on August 12, 2005, and

rendered its final decision on November 16, 2005.

On December 20, 2005, Roddy filed a complaint, which she subsequently amended on

February 28, 2006, in the United States District Court for the Northern District of Georgia.  (Doc.

Nos. 1, 1-5).  The case was then transferred to this Court on June 27, 2006.  On September 1,

2006, Defendant filed an answer to Roddy's amended complaint (Doc. No. 12), and discovery

commenced.  Defendant thereafter filed the instant motion for summary judgment.

## II.      STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment should be granted

when "the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56; see also Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 248-51 (1986).  When deciding a motion for summary

judgment, the Court must view the facts in the light most favorable to the nonmoving party, who

is "entitled to every reasonable inference that can be drawn from the record."  Merkle v. Upper

Dublin Sch. Dist., 211 F.3d 782, 788 (3d Cir. 2000).  Summary judgment must be granted

against a party that "fails to make a showing sufficient to establish the existence of an element

essential to that party's case and on which that party will bear the burden at trial."  Celotex Corp.

v. Catrett, 477 U.S. 317, 322 (1986).

With respect to the sufficiency of the nonmoving party's evidence, a court should grant

9

summary judgment where such evidence is merely colorable, conclusory, or speculative. Anderson, 477 U.S. at 249-50.  There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts.  Id. at 252; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

## III.   DISCUSSION

In the instant motion for summary judgment, Defendant argues that summary judgment should be granted because Roddy has failed to carry her burden in presenting a prima facie case of either sex, age, or disability discrimination or of retaliation.  Defendant further argues that Roddy cannot demonstrate that the reasons given for the termination of her employment were pretextual.  The Court will address each argument in turn.

### A.   Sex Discrimination

Consideration of Roddy's Title VII discrimination claims begins with the familiar burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under that analysis, although the plaintiff bears the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff," St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253(1981)), once a plaintiff has demonstrated a "prima facie case of discrimination" then the plaintiff is entitled to a "presumption that the employer unlawfully discriminated against the employee," St. Mary's, 509. U.S. at 506 (quoting Burdine, 450 U.S. at 254).  In order to rebut the presumption, an employer bears the burden "to articulate some legitimate, nondiscriminatory reason for the employee's rejection."  McDonnell Douglas, 411 U.S. at 802.  Should the employer carry this burden, the plaintiff then has an opportunity to demonstrate that the reasons

offered by the employer were not its true reasons, but rather were a pretext for discrimination.  Id.
at 804.

### 1.    *Prima Facie Case*

Under the first step of the McDonnell Douglas analysis, the Court must consider whether

Roddy met her burden in making a prima facie case of sex discrimination.  Although "the

elements of a prima facie case depend on the facts of the particular case," Jones v. Sch. Dist. of

Philadelphia, 198 F.3d 403, 411 (3d Cir. 1999), the Third Circuit has previously held that a

plaintiff may establish a prima facie case of discriminatory discharge by showing "that he or she

is a member of a protected class and was qualified for an employment position, but that he or she

was either not hired for that position or was fired from it 'under circumstances that give rise to an

inference of unlawful discrimination,'" Waldron v. SL Indus., Inc., 56 F.3d 491, 494 (3d Cir.

1995) (quoting Burdine, 450 U.S. at 253).  When deciding whether the circumstances give rise to

an inference of unlawful discrimination, courts sometimes look to whether "similarly situated"

nonmembers of the protected class were treated more favorably than the plaintiff.  See, e.g.,

Economos v. Scotts Co., No. 05-271, 2006 WL 3386646, at *5 (E.D. Pa. Nov. 21, 2006).

However, a plaintiff is not obligated to make such a showing.  See Iyer v. Everson, 382 F. Supp.

2d 749, 756 n.14 (E.D. Pa. 2005) ("Showing that similarly situated employees outside of

plaintiff's protected class were more favorably treated under similar circumstances is one way,

but not the only way, to raise an inference of unlawful discrimination."); Klimczak v. Shoe Show

Cos., 420 F. Supp. 2d 376, 382-83 (M.D. Pa. 2005).

Here, Defendant contends that Roddy cannot satisfy her burden to show a prima facie

case of sex discrimination because she has not identified any non-probationary employees that

were treated differently from her.  As discussed above, such a showing is not required by law,

nor does it seem appropriate in this case as there do not appear to have been any similarly

situated employees with whom Roddy could offer such a comparison.  While Roddy's status as a

probationary employee is a significant factor that could account for differences in decisions

regarding her employment, the lack of a similarly situated employee is not fatal to Roddy's prima

facie claim of sex discrimination.  It only means that she will be unable prove it by that method.

Roddy attempts to create an inference that the termination was based on an illegal

criterion by referring to her coworkers' testimony that other male employees, albeit non-

probationary employees, were treated better than her.  Given with the "low bar for establishing a

prima facie case of employment discrimination," Scheidemantle v. Slippery Rock Univ. State

Sys. of Higher Educ., 470 F.3d 535, 539 (3d Cir. 2006), the Court finds such evidence supports

the conclusion that Roddy has established a prima facie case of sex discrimination.

### 2.      *Pretext Analysis*

That Roddy can establish a prima facie case of sex discrimination does not end the

Court's analysis, however, because Defendant has proffered several non-discriminatory reasons

for terminating Roddy's employment.  In particular,  Defendant claims that Roddy's employment

was terminated before the expiration of her probationary period because of poor work

performance.  Indeed, in the termination letter, Defendant cited to a number of incidents

supporting its claim.  Thus, the Court finds that Defendant has met its "relatively light burden

[of] articulating a legitimate reason for the unfavorable employment decision." Fuentes v.

Perskie, 39 F.3d 759, 763 (3d Cir. 1994).

After a defendant advances a legitimate nondiscriminatory reason for the adverse

employment action, the burden at summary judgment shifts back to the plaintiff to identify

"sufficient evidence from which a jury could conclude that the purported reasons for [the action]

were in actuality a pretext for intentional [sex] discrimination." Jones, 198 F.3d at 412.  A

plaintiff may show such pretext by either: (1) identifying evidence that would allow a reasonable

factfinder to "believe that discrimination was more likely than not a motivating or determinative

cause of the adverse employment action;" or (2) by casting sufficient doubt upon the legitimate

reasons proffered by the defendant so that a reasonable factfinder could conclude that the reason

was a post hoc fabrication or else did not actually motivate the employment action.  Fuentes, 32

F.3d at 764.  It is not enough for a plaintiff to demonstrate that an employer's decision was

"wrong or mistaken." Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 (3d Cir. 1999)

(citing Fuentes, 32 F.3d at 765).  Instead, in order to cast sufficient doubt on the proffered reason,

a plaintiff must point out "weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a reasonable

factfinder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer

did not act for the asserted non-discriminatory reasons.'" Fuentes, 32 F.3d at 765 (internal

citations omitted).  In other words, a plaintiff must show that the reasons advanced by the

employer were not merely wrong, but were "so plainly wrong that [they] cannot have been the

employer's real reason[s]." Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir.

1997).

      Roddy fails to meet her burden under either method.  First, she has not identified

evidence sufficient to allow a reasonable factfinder to infer that the decision to terminate her

employment was more likely than not motivated by her gender.  Though some of Roddy's

co-workers acknowledged that Wolf seemed to treat her differently, none attributed such

differences to her gender.  In fact, when asked directly as to why he believed Roddy was treated

differently, Frank DeNofa stated his belief that Roddy was terminated because of her work-

related injury, not because of her sex.

Moreover, though Wolf never hired any females prior to Roddy, there is nothing in the

record that would allow a reasonable factfinder to attach any special significance to that fact

alone.  Roddy's claims are supported by little more than her subjective belief that she was treated

unfairly because of her sex and that Wolf treated her rudely from the first day of her employment.

For example, Roddy's deposition testimony illustrates her subjective belief that Wolf

discriminated against her on the basis of her sex:

> Q.     [C]ould you identify . . . what your claims of discrimination
>        are?  What are you claiming?
> A.      [Wolf] did not treat me as equal as he did the other guys.  I
>        was treated like a doormat.  He did not want me there.  He
>        made it a very point to make sure that I was not there, that I
>        would leave.  How do you treat somebody you don't want
>        there?  You don't show them the bathrooms, you don't show
>        them the lockers.  You don't show them where the toolrooms
>        are.  You don't tell them nothing.  You go, hey, go dig . . . up
>        some tools out of that box over there.  You know, you just
>        don't treat anybody you want to keep that way.  It was just
>        horrible, absolutely horrible.
> ***
> Q.     Why do you think you were terminated?
> A.     Because he wanted to get ride of me.   He knew that I knew
>        what I was talking about, and he just could not stand me.  He
>        just did not like me from day one.  You treat somebody like
>        that, you know.
> ***
> Q.     Why don't you think he liked you?
> A.     Because I guess I was female, I don't know.  I don't know
>        why he don't like me.
> ***

> Q.     Did he ever say anything derogatory about you being a
>        woman or being –
> A.     No. . . .

(Roddy Dep. 174-177.)  Significantly, Roddy presents no meaningful objective evidence that would satisfy her burden to show pretext.  Though the evidence described above aided her in establishing her prima facie case, it is insufficient evidence for a reasonable factfinder to conclude that—despite the proffered legitimate nondiscriminatory reason—sex discrimination was "more likely than not a motivating or determinative cause" of Roddy's termination.

Second, Roddy fails to cast sufficient doubt on Defendant's proffered reasons for her termination.  Her argument rests on the fact that Wolf did not issue written warnings until months after the complained-of incidents.  It is undisputed that such written warnings were unnecessary and that progressive discipline did not apply to probationary employees.  (Annucci Dep. 12-13, 17-21; Pl's Ex. E.)  Accordingly, a reasonable factfinder could not disbelieve Defendant's justifications solely on the basis that Wolf did not formally reprimand or discipline Roddy.  Furthermore, Roddy does not contest, for example, that the incidents cited by Defendant took place, nor does she suggest that she was told or otherwise led to believe that the incidents would not affect her employment status at the conclusion of the probationary period, or that Defendant's handling of the situation diverged from the way it had handled similar situations in the past.  Absent some basis to disbelieve Defendant's proffered nondiscriminatory reasons, Plaintiff cannot sustain her burden to show pretext.  Because Roddy has failed to submit evidence which would either allow the factfinder to infer either that discrimination was more likely than not a cause of her termination or that the legitimate reasons proffered by Defendant were fabricated, summary judgment shall be granted in Defendants' favor on Roddy's sex-

15

discrimination claims.

### B.      Age Discrimination

In considering Roddy's age-discrimination claim, the Court must use a burden-shifting

analysis similar to that described above.  Keller, 130 F.3d at 1108.  Defendant argues that Roddy

fails to establish a prima facie case of age discrimination and the Court agrees.

In order to establish a prima facie case of age discrimination, a plaintiff must show that

she was: (i) a member of the protected class, i.e., was 40 years of age or older; (ii) discharged;

(iii) qualified for the job; and (iv) replaced by a sufficiently younger person to create an inference

of age discrimination.  Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir. 1995); see also

O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 313 (1996).[3]  Roddy's age-

discrimination claim rests entirely on a question asked by Wolf—devoid of the context in which

it was made—about Roddy's age and his statement that "he wished he had some younger ones

like Joe Rath and some other [employees] or something."  (Roddy Dep. 177; Pl's Ex. A.)  Roddy

makes no attempt to demonstrate that Wolf replaced her with a younger employee.  Nor does she

proffer, for example, any evidence that older employees were given fewer opportunities than

younger ones.  Put simply, there is insufficient evidence to suggest that Defendant terminated

Roddy's employment because of her age.  Certainly, the burden to show a prima facie case "is

not intended to be onerous."  Sempier, 45 F.3d at 728.  But it is nevertheless a burden.  And it is

one that Roddy has not carried.  Accordingly, Defendant's motion for summary judgment must

---

[3] The Third Circuit has held that in reduction-of-force cases, a plaintiff can satisfy the
fourth element by demonstrating "that the employer retained someone similarly situated to him
who was sufficiently younger."  Anderson v. Consol. Rail Corp., 297 F.3d 242, 249 (3d Cir.
2002); Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231, 234-36 (3d Cir. 1999).

be granted on Roddy's age-discrimination claims.

### C.     Disability Discrimination

Roddy's next claim is that she was discriminated against on the basis of a disability in violation of the Rehabilitation Act.  A plaintiff must show three elements to establish a prima facie case of discrimination: "(1) that he or she has a disability; (2) that he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he or she was nonetheless terminated or otherwise prevented from performing the job."  Wishkin v. Potter, 476 U.S. 180, 184-85 (3d Cir. 2007) (quoting Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996)).

Defendant argues that Roddy failed to establish the first element of a prima facie case of disability discrimination because she did not have a "disability" within the meaning of the Rehabilitation Act.  To establish that she is an "individual with a disability," Roddy must show that she either: "(1) [has] a physical or mental impairment which substantially limits one or more of such [her] major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an impairment."  Wishkin, 476 U.S. at 185 (citing 29 U.S.C. § 705(20)(B)).  To be substantially limited in a major life activity—such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working," see 29 C.F.R. § 1630.2(i)—an individual must have "an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." Toyota Motor Mfg. v. Williams, 534 U.S. 184, 197 (2002).  The regulations provide several factors for consideration as to whether an individual is so limited: "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The

17

permanent or long term impact, or the expected permanent or long term impact of or resulting

from the impairment." 29 C.F.R. § 1630.2(j)(2).

Roddy argues that her "knee injury is a disability because it is a physical impairment that

substantially limited [her] ability to walk, bend, use the restroom and perform daily household

activities." (Pl's Br. in Opp'n 24.) This characterization does not accurately reflect the evidence

of record. Indeed, Roddy's deposition testimony concerning an inability to walk or go to the

restroom or perform daily activities refers to the time during which she was recovering from knee

surgery—not at the time of her discharge—and there is no testimony that she was unable to do

such tasks upon her return. Neither does the medical evidence indicate severe restrictions on her

daily life activities; Roddy's physician provided work restrictions, but Roddy fails to identify any

objective evidence that would allow a reasonable factfinder to conclude that, at the time of her

discharge, her injury prevented or severely restricted her—either on a temporary or permanent

basis—from engaging in activities of "central importance" to her life. And as Defendant argues,

and Plaintiff fails to rebut, there is no suggestion in the record that Defendant would have had

any knowledge that Roddy's injuries had such an effect.

Even assuming that Roddy were disabled, she would fail to meet her burden to establish

the second element of a prima facie case of disability discrimination. Roddy admits that she was

not "otherwise qualified" to continue her work as an electrician because of the work restrictions

imposed; rather, she contends that she could have been reassigned to do "control work." This

contention fails. As the Third Circuit has held, "[a]n employer is not required to create a job for

a disabled employee." Mengine v. Runyon, 114 F.3d 415, 418 (3d Cir. 1997). Though "a federal

employer has a duty to reassign nonprobationary employees if they become unable to perform the

essential functions of their jobs, unless the reassignment would cause the employer undue hardship," the plaintiff still bears the burden to "demonstrate that there were vacant, funded positions whose essential duties he was capable of performing, with or without reasonable accommodation, and that these positions were at an equivalent level or position as [her] former job." Id. (quoting Shiring, 90 F.3d at 832.  Here, Roddy has not satisfied this burden; instead, she improperly attempts to shift the burden to Defendant.  (Pl's Br. in Opp'n 24) ("Defendant has failed to identify any evidence indicating that Plaintiff's request was unreasonable or that it would cause an undue hardship.").  The operative inquiry in a case such as this is whether, with the reasonable accommodation of reassignment, a plaintiff would be otherwise qualified to perform the essential functions of the job.  The burden is therefore on Roddy to show that the accommodation was reasonable—not the other way around.  Without such evidence that the requested accommodation (in this case, assigning "control work") was reasonable, Roddy cannot establish the second element of her prima facie case.

Because Roddy fails to establish either the first or second element of her prima facie case, summary judgment shall be granted in Defendant's favor on Roddy's disability-discrimination claim.

**D.     Retaliation**

Roddy's final claim is that the termination of her employment was in retaliation for pursuing her discrimination claims.  To state a prima facie Title VII retaliation claim, a plaintiff must proffer evidence to establish three elements: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment

action." <u>Moore v. City of Philadelphia</u>, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting <u>Nelson v.</u>

<u>Upsala Coll.</u>, 51 F.3d 383, 386 (3d Cir. 1995)).  Defendant argues that Roddy's retaliation claim

should be dismissed because she failed to identify a causal connection between any protected

activity and the allegedly retaliatory act.  To satisfy the third element, a plaintiff must present

evidence "sufficient to raise the inference that her protected activity was the likely reason for the

adverse action."  <u>Kachmar v. Sungard Data Sys.</u>, 109 F.3d 173, 177 (3d Cir. 1997).

     In her brief in opposition to the motion to dismiss, Roddy implicitly concedes the lack of

a causal connection between her pre-employment EEO activity and her termination.  Roddy

nonetheless claims that the filing of her formal EEO complaint on January 7, 2004, constituted

the protected activity that led to her termination, and argues that the temporal proximity of the

complaint and her termination suggests a causal connection.  Defendant accurately notes that

Roddy filed her formal complaint nearly two months after Wolf sought the aid of Carol Annucci

to initiate the termination process.  But in Wolf's email explicitly states that an EEO complaint

was filed *within* a week of his recommendation to terminate Roddy's employment:

> I also want you to know that she had filed an informal grievance
> against me, asking to [be] assigned to a different supervisor.  I denied
> the request.  I explained to the union official: the reason I was asking
> her what she was doing, or where she was so often was due to the
> previous[ly] mentioned items.  This week she filed an EEO complaint
> against me with Norfolk EEO.  I want everyone to understand, I try
> to treat all the electricians the same.  That I don't intentionally favor
> anyone over anyone else.

(Def's Ex. 22.)

     In order for mere temporal proximity to constitute "sufficient evidence of causality to

establish a prima facie case . . . *the temporal proximity must be 'very close.'*"  <u>Clark County Sch.</u>

Dist. v. Breeden, 532 U.S. 268, 273 (2001) (emphasis added).  Here, the temporal proximity may not be so close as to singlehandedly raise the inference that the termination of Roddy's employment was motivated by her protected EEO activity.  When it is coupled with the overall circumstances—including the facts that Wolf was well aware of the EEO process, that he had failed to formally discipline her in the past, and that Roddy perceived differences in the treatment of her and her male counterparts—a reasonable juror could conclude that Roddy's initiation of the EEO process prompted Wolf to seek Roddy's termination.  Because a reasonable juror could potentially find that Roddy's employment was terminated on the basis of retaliation, Defendant's motion for summary judgment will be denied.

IV.     **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment will be granted in part and denied in part.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CONNIE D. RODDY,** | : | |
| **Plaintiff** | : | **Civil Action No. 1:06-CV-1279** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **DONALD C. WINTER, Secretary of the** | : | |
| **Department of the Navy,** | : | |
| **Defendant** | : | |

## <u>ORDER</u>

**AND NOW**, on this 31st day of March, 2008, for the reasons set forth in the accompanying memorandum, **IT IS HEREBY ORDERED THAT** Defendant's motion for summary judgment (Doc. No. 19) is **DENIED** with respect to Plaintiff's retaliation claim but **GRANTED** in all other respects.

s/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania